UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

JAKARTA GROGAN                              CIVIL ACTION NO. 6:12-cv-02659

VERSUS                                      MAGISTRATE JUDGE HANNA

TRITON DIVING SERVICES, LLC                 BY CONSENT OF THE PARTIES
AND W&T OFFSHORE INC.


## <u>MEMORANDUM  RULING</u>

This matter comes before this Court for trial on the merits of two cross-claims pursuant to 28 U.S.C. § 636(c).  Jurisdiction is premised upon 28 U.S.C. § 1333, as the plaintiff alleged that he was injured while he was working on a vessel offshore. Named as defendants are W&T Offshore, Inc. and Triton Diving Services, LLC., who filed cross-claims for contractual defense and indemnity against each other.  The claims of the plaintiff and the intervenor were settled with the defendants, and all other claims were dismissed.  Therefore, the only claims remaining to be resolved are the defendants' cross-claims for contractual defense and indemnity.

The defendants filed motions for summary judgment dealing with the cross-claims, which were both denied on the basis that genuine issues of material fact were in dispute.  However, at the time of oral argument, the defendants consented to submit their cross-claims for decision on the merits in the event the motions were denied,

based upon the evidence already presented in the exhibits to the summary judgment briefs.  Those exhibits were all admitted into evidence without objection.  The defendants were also given the opportunity to introduce any additional exhibits.  Both parties advised that there is no further evidence to be considered, and the matter has now been submitted for decision. Therefore, pursuant to Fed.R.Civ.P. 52(a), this Court makes the following findings of fact and conclusions of law.  To the extent that any conclusion of law is deemed to be a finding of fact, it is adopted as such, and to the extent that any finding of fact is deemed to be a conclusion of law, it is also adopted as such.

FINDINGS OF FACT

In October 2011, Triton and W&T entered into a contract by which Triton agreed to provide a dive support vessel (DSV), personnel, and equipment to support W&T's Vermillion block 279 pipeline recommissioning project.  The Triton personnel who worked on the job were primarily divers, tenders, and dive supervisors who were all quartered aboard the vessel supplied by Triton, the DSV TRITON ACHIEVER.  Triton also employed the captain and crew.  The contract incorporated by reference a Master Service Contract (MSC) dated April 7, 2008 between Triton and W&T, which contains the defense and indemnity provisions at issue.

-2-

The project involved two separate pipelines that were out of service.  One was an 8-inch pipeline that had been previously owned by Chevron and transferred to a company called GOMEX.  The other was a 4-inch pipeline that was owned by W&T.  Both pipelines were utilized for oil service, and both had been previously de-oiled.  It was the job of W&T to recommission both pipelines.  The detailed scope of work and the procedure to be followed to complete the project were directed by W&T in a Request for Proposal dated September 7, 2011 and its attachments.  In order to be recommissioned, the pipelines had to be hydrotested and then de-watered.  In the first phase, W&T wanted to isolate the 4-inch pipeline from the 8-inch pipeline.  Part of Triton's work involved subsea operations to disconnect the 4-inch pipeline from a subsea tie-in assembly and install a blind flange so that the hydrotest could be performed on the 4-inch pipeline.  Another part of Triton's work involved isolating subsea valves on the 8-inch pipeline so that the hydrotest could be performed on that pipeline.

The pipelines were tied into platforms at Vermilion blocks 279, 265A, and 282.  W&T personnel, its on-site representatives, GOMEX representatives, the hydrotest personnel, and other contract personnel not affiliated with Triton worked aboard these platforms.  Some work aboard the platforms that had to be done as part of the overall project included changing out risers as well as piping that had corroded.  This work

-3-

was done by different contractors utilizing a different type of support vessel, the offshore supply vessel (OSV) ODYSSEY DILIGENT, which was owned by Odyssey Marine.  However, all of the work was under the oversight and project management of W&T's project manager, Alan Greig, and his on-site representatives.  In addition, the funding for the operations of Triton as well as for the ODYSSEY DILIGENT end of the project was provided by W&T under a single Authorization for Expenditure (AFE).  Thus, while Triton personnel retained control over decisions related to the safe operation of the DSV and the diving operations themselves, e.g. ceasing operations due to weather or setting diving time limits and rest for divers, all of the directives pertaining to the pipeline recommissioning project itself, i.e. what work was to be performed where and when, came from W&T and its on-site representatives.

Once the hydrotest portion of the project was completed, the de-watering process commenced, in which the pipelines had to be completely cleaned of residual hydrocarbons, impurities, etc.  A pig was used to push water and other fluids through the pipelines and up through a hose to filtration equipment located on the TRITON ACHIEVER where the fluids were processed.  Any natural gas would be vented, and the water with hydrocarbons and other impurities would be collected in a tank aboard the vessel where the water would be treated.  The filtered water would be dumped

-4-

overboard and the residual materials would be disposed of shoreside.  An occasional byproduct of this process was the possibility of encountering deadly hydrogen sulfide gas ($H_2S$) which can accumulate in the pipelines because it is contained in the product from the wells or is the result of bacterial decomposition of organic materials that infiltrated the pipelines.

Triton subcontracted with a company called Siemens to perform the wastewater treatment, and as part of their task, Siemens had to monitor and sample the fluids to assure that compliance with overboard discharge requirements could be maintained.[1] The parameters that were monitored were static sheen, oil and grease, pH, and toxicity-priority pollutants.  Since the pipelines had previously been flushed several months earlier, and were flushed with chemically treated seawater, Mr. Greig with W&T did not think $H_2S$ would be an issue during the de-watering process, and therefore, it was not addressed in the original scope of work with Triton or any other contractor.  It was also not included in the scope of work between Triton and Siemens.  However, Siemens's equipment had the capability of monitoring for $H_2S$ in the tank where fluids were being collected, and in fact, Siemens did monitor for $H_2S$ in the returns from the pipelines.

---

[1]     Triton also subcontracted with a survey company, Cochrane Technology, that was utilized to properly position the four-part anchoring system on the DSV.

On December 1, 2011, a segment of the 8-inch GOMEX pipeline that ran from an Apache platform at Vermilion block 265 to a riser at Vermilion block 282 was being flushed.  The pig was pushed from the V265 platform through the pipeline to the riser on V282 where the TRITON ACHIEVER was to receive the pig.  As the fluids ahead of the pig were being collected and processed on the TRITON ACHIEVER, Siemens reported that $H_2S$ was showing up in the fluids in their tank. The findings were reported to Triton's dive supervisor, Philip Begley, who in turn notified the Triton dive superintendent, John Trachsel, who shut down the job. Trachsel contacted the shoreside Triton project manager, David Grady, and notified him that the job had been shut down while W&T's company representative on the vessel, Bruce Arnold, notified Greig that the job had been shut down.  Neither W&T representative disputed Trachsel's decision to shut the job down even though W&T remained responsible for the day-rate charges for the TRITON ACHIEVER and its personnel.

A conference call was held between Grady, Arnold, Greig, and possibly a supervisor aboard the vessel, and the decision was made to demobilize from the location because of the lack of proper equipment to continue the de-watering operation in a safe manner.  Grady instructed the dive superintendent to take the

TRITON ACHIEVER to Amelia, Louisiana to offload the $H_2S$ that had accumulated in the Siemens tank.

In order for the working environment aboard the TRITON ACHIEVER to be returned to safe levels for the continuation of the de-watering process, safety and monitoring equipment had to be obtained and $H_2S$ monitoring and training for personnel had to be arranged. Greig recommended Tiger Rentals, Ltd. d/b/a Tiger Safety (Tiger) as the contractor to handle the $H_2S$ issues based on his previous working relationship with them.

The fluids coming out of the pipelines were going to be processed in the Siemens equipment on the TRITON ACHIEVER; therefore, the $H_2S$ monitoring was to be done on the vessel. Further, the individuals needing safety equipment and training were the personnel who were to work on the TRITON ACHIEVER. Of the twenty-nine who were initially trained, twenty-seven were employed by Triton. Given that most of Tiger's work was to be done aboard the TRITON ACHIEVER, Greig recommended that Grady contact Tiger to coordinate the logistics of getting the monitoring and safety equipment loaded and the training of the personnel done on the TRITON ACHIEVER before the de-watering operations resumed.

The contract between Triton and W&T did not obligate Triton to provide a subcontractor to deal with the issues raised by the $H_2S$ event; however, the contract

did contain a provision for a cost plus 10% charge to W&T for "Additional Personnel, Third Party Services, Materials, Mob/Demob, Equipment as requested by [W&T]." However, rather than "request" that Triton subcontract the $H_2S$ work, Greig did just the opposite.  In order to avoid the 10% charge, Greig, with the agreement of Triton and Tiger, had W&T contract directly with Tiger to provide the $H_2S$ training, equipment, and monitoring on the TRITON ACHIEVER.  Further, because the possibility existed of encountering $H_2S$ at the Vermilion block 279 location where the 4-inch W&T pipeline was being de-watered, Greig also contracted with Tiger to provide safety equipment at that location aboard the ODYSSEY DILIGENT.

Tiger sent quotes and rental contracts to Greig, which he approved.  Tiger's operations manager, David Lacombe, considered his customer to be W&T, and he corresponded directly with Greig when changes were made to the number of Tiger personnel or regarding the return of equipment.  Two technicians, as well as safety and monitoring equipment, were sent by Tiger to the TRITON ACHIEVER.  Safety equipment was sent by Tiger to the ODYSSEY DILIGENT.  W&T was billed directly for all of this by Tiger and a separate, single AFE was used for the Tiger equipment/services on both vessels.

The plaintiff, Jakarta Grogan, was employed by Tiger and was one of the technicians assigned to work on the $H_2S$ issue.  Once Grogan arrived on the TRITON

ACHIEVER, Arnold, as the company representative for W&T on the vessel, gave Grogan his day-to-day instructions.  Arnold decided when Grogan was to take samples from the fluids that were removed from the pipeline, and Grogan provided the results of the sampling to Arnold.  Grogan would then return to the living quarters and wait for Arnold to request another sample.  The work tickets filled out by Grogan were all approved by Arnold.

Grogan and his co-employee stayed on the vessel from December 7 to December 11, when the vessel returned to port because of bad weather.  When the vessel went back out on December 14, W&T, acting through Greig, decided that Tiger's crew should be cut down from two men to one, and Grogan went back out alone.  Grogan remained on the job through December 19.  The $H_2S$ levels diminished over time, and W&T decided on or about December 17 that Tiger's services were no longer needed.  Arnold advised Grogan that he would be taken in by crew boat.

Grogan's injury occurred after his work on the job was completed and after he was advised by W&T that he would be leaving the vessel and going back to shore. The defendants settled the claims of the plaintiff and intervenor and each defendant seeks reimbursement of its defense costs and settlement contributions from the other, pursuant to the indemnity provisions contained in the MSC.

The MSC contains reciprocal defense and indemnity provisions, which provide in pertinent part:

> 5.1    Contractor [Triton] shall release, indemnify, protect, defend and hold W&T Group harmless from and against any and all claims in respect of personal or bodily  injury to. . . any member of Contractor Group in any way, directly or indirectly, arising out of, connected with, incident to, or resulting from or relating to the performance of the contract or the use by Contractor Group, or their presence on, any premises or property owned, operated, chartered or controlled by W&T Group or used for transportation of Contractor Group property or personnel, in any way, directly or indirectly, arising out of, connected with, incident to, or resulting from or relating to the performance of the contract . . . .
>
> * * * * *
>
> 5.3    W&T shall release, indemnify, protect, defend and hold Contractor Group harmless from and against any and all claims in respect of personal or bodily injury to. . . any member of W&T Group in any way, directly or indirectly, arising out of, connected with, incident to, or resulting from or relating to the performance of the contract . . .

The MSC defines the term "Contractor Group" as "Contractor [Triton], its parent, subsidiary and affiliated companies, and their respective parents, subsidiary and affiliated companies, and all of their respective officers, directors, representatives, employees and invitees on the Work sites and insurers of all of the foregoing."

The MSC defines the term "W&T Group" as "W&T, its parent, subsidiary and affiliated or related companies, its and their working interest owners, co-lessees, co-owners, partners, farmors, farmees, joint operators, and joint venturers, if any, and all of their respective officers, directors, representatives, employees and invitees on the Work sites and insurers of all of the foregoing."

The MSC, which states that it is governed by the general maritime law of the United States or alternatively by Texas law, does not define the term "invitee."  The term "Work sites," used as the modifier of "invitees" in the definition of the respective groups, is also not defined.  However, "Work" is defined to include "the services, work and/or goods to be performed or furnished by Contractor from time to time for W&T, as mutually approved and agreed to in advance by Contractor and W&T . . ."

In accordance with these provisions of the MSC, Triton must defend and indemnify W&T when a claim is asserted by any member the "Contractor Group," and W&T must defend and indemnify Triton when there is an injury to any member of the "W&T Group."  Triton argues that Grogan was W&T's invitee, and therefore, a member of the "W&T Group" such that W&T owes Triton defense and indemnity for Grogan's claims.  W&T argues that Grogan was Triton's invitee, and therefore, a member of the "Contractor Group" such that Triton owes W&T defense and

-11-

indemnity.  Alternatively, W&T argues that Grogan was the invitee of both Triton and W&T, negating either party's defense and indemnity obligations.

<u>**CONCLUSIONS OF LAW**</u>

The parties are in agreement that the contract is governed by the general maritime law.  Applying the six-factor analysis set forth in *Davis and Sons, Inc. v. Gulf Oil Corporation*,[2] to the facts of this case, this Court also concludes that the contract is a maritime contract, and therefore, its interpretation is governed by the general maritime law.[3]

"Under federal maritime law, '[a] contract of indemnity should be construed to cover all losses, damages, or liabilities which reasonably appear to have been within the contemplation of the parties, but it should not be read to impose liability for those losses or liabilities which are neither expressly within its terms nor of such a character that it can be reasonably inferred that the parties intended to include them within the indemnity coverage.'"[4]  "A maritime contract containing an indemnity agreement, whether governed by federal maritime or Louisiana law, should be read as a whole and its words given their plain meaning unless the provision is

---

[2]     919 F.2d 313, 316 (5th Cir.1990), reh'g denied, 924 F .2d 1054 (1991).

[3]     *Corbitt v. Diamond M. Drilling Co*., 654 F.2d 329, 332 (5th Cir. 1981).

[4]     *Fontenot v. Mesa Petroleum Co*., 791 F.2d 1207, 1214 (5th Cir.1986) (quoting *Corbitt*, 654 F.2d at 333).

ambiguous."[5]  The parties' disagreement concerning the meaning of a contract does not make it ambiguous, nor does uncertainty or a lack of clarity in the language chosen to be included in the contract.[6]  Whether a contract is ambiguous is a question of law for the court to decide.[7]

The Court concludes that the indemnity provisions set forth in the MSC are not ambiguous.  The language of the MSC contemplates that persons working on W&T's pipeline recommissioning project will be classified as either members of the W&T Group or as members of the Contractor Group depending on whether they were the "invitees on the Work site" of W&T or Triton.  Based on the facts of this case, the Court concludes that Grogan was the invitee of W&T and not the invitee of both Triton and W&T.

A test for invitee status that originated under Louisiana state law has been applied in maritime contracts where, as here, the contract does not define the term.[8]

---

[5]       *Hardy v. Gulf Oil Corp.*, 949 F.2d 826, 834 (5th Cir. 1992).  See, also, *Breaux v. Halliburton Energy Servs.*, 562 F.3d 358, 364 (5th Cir. 2009).

[6]       *Hardy*, 949 F.2d at 834.

[7]       *D.E.W., Inc. v. Local 93, Laborers' Intern'l Union of N. Am.*, 957 F.2d 196, 199 (5th Cir. 1992); *Louisiana Land & Exploration v. Offshore Tugs, Inc.*, 23 F.3d 967, 969 (5th Cir. 1994).

[8]       *Blanks v. Murco Drilling Corp.*, 766 F.2d 891, 894 (5th Cir. 1985) ; *Brown v. Sea Mar Management, LLC,* 288 Fed. App'x 922, 924 (5th Cir. 2008); *Alex v. Wild Well Control, Inc.,* No. 97-9183, 2009 WL 2599782, at *9 (E.D. La. Aug. 18, 2009) ("when a contract does not specifically define 'invitee' courts adopt the *Blanks* definition."); *Reynaud v. Rowan Companies, Inc.*, No. 98-1326, 1999 WL 65022 at *3 (E.D. La. Feb. 5, 1999); *Clayton Williams Energy, Inc. v.*

Under that test, an invitee is "a person who goes onto premises with the expressed or implied invitation of the occupant, on business of the occupant or for their mutual advantage."[9]  A contractor or subcontractor may be an invitee, but an entity does not have to be a contractor or subcontractor to be an invitee because "the scope of an invitee can include companies that are contractors or subcontractors of the parties being indemnified directly."[10]  Therefore, the fact that Tiger did not contract directly with Triton is not, in and of itself, dispositive of W&T's argument that Tiger was Triton's invitee.

The case heavily relied upon by W&T, *Brown v. Sea Mar Management,* indicates that the term "occupant," for purposes of determining invitee status, "does not require that an occupant actually use or be physically present on the premises. Control of or a possessory right in the property or premises is sufficient."[11]  In *Brown,* Williams Field Services Company hired Offshore Oil Services, Inc. (OOSI) to provide vessels for painting and sandblasting operations.  OOSI then entered into a

---

*Nat'l Union Fire Ins. Co. of Louisiana*, No. 03-2980, 2004 WL 2452780, at *5 (E.D. La. Nov. 1 2004) aff'd sub nom., *Clayton Williams Energy, Inc. v. Nat'l Union Fire Ins. Co. of La.*, 161 Fed. App'x 378 (5th Cir. 2006)

[9]      *Blanks*, 766 F.2d at 894; *Brown*, 288 Fed. App'x at 924; *Alex*, 2009 WL 2599782, at *10; *Clayton Williams Energy*, 2004 WL 2452780, at *5; *Reynaud*,1999 WL 65022, at *3.

[10]      *Alex,* 2009 WL 2599782, at *10*; Reynaud,* 1999 WL 65022 at 3; *Clayton Williams Energy*, 2004 WL 2452780, at *5.

[11]      *Brown*, 288 Fed. App'x at 925.

time charter agreement with Sea Mar, by which Sea Mar provided the M/V CAPE COOK to be used as a work platform and living quarters.  Williams then hired L&L Sandblasting to do the actual painting and sandblasting.  The plaintiff was an L&L employee who was injured while swinging from a platform to the deck of the CAPE COOK.  Like the other L&L employees, the plaintiff ate, slept, and worked on the CAPE COOK during the job.  Following his injury, the plaintiff sued Sea Mar and Sea Mar sought contractual indemnity from OOSI.  The issue to be resolved was whether the plaintiff was OOSI's invitee under the same definition of that term as is applicable in this case.

OOSI argued that it was not an occupant of the vessel because it had no personnel on board and it had turned the vessel over to Williams.  OOSI also argued that the plaintiff was Williams's invitee and that Sea Mar obtained the mutual advantage from the work the plaintiff performed.  Whether the plaintiff was also an invitee of Williams did not change the court's analysis as the court was not called upon to decide whether the plaintiff was Williams's invitee.   The indemnity provisions being construed were in a contract between OOSI and Sea Mar.

The court found, pursuant to the agreement between those two parties, that the vessel was under the control of OOSI, the master was obligated to follow the directions of OOSI, and if OOSI instructed Sea Mar to stop taking direction from

Williams, Sea Mar was obligated to do so.  Since OOSI could decide where the vessel went, who could come on board, etc., the vessel was under the ultimate direction, control, and command of OOSI.  Therefore, OOSI was an occupant of the vessel.

W&T's argument that W&T did not "charter" the TRITON ACHIEVER is non-availing as that creates too narrow an interpretation of the word "occupant."  W&T entered into a contract with Triton to provide a diving support vessel to W&T to support the pipeline recommissioning project.  The use of the vessel was vital to W&T being able to conduct the undersea operations.  Without the diving support vessel, W&T's project would not get done.  W&T, or its company representative who was aboard the vessel at all material times, directed the DSV where to go, what to do, and when to do it insofar as the work of the pipeline recommissioning project was concerned.  W&T retained control to direct the companies that had contracted with W&T to work aboard the vessel.  While the crew of the TRITON ACHIEVER retained control over decisions related to the safe operation of the vessel such as ceasing operations due to weather, the direction, command, and control of the vessel as it pertained to the work on the pipeline recommissioning project itself came from W&T or its company representative.  Thus, the Court concludes that W&T was an occupant of the vessel.  Whether Triton was also an occupant of the vessel does not alter the analysis of W&T's status as an invitor.

-16-

As far as the jurisprudence is concerned, while there are no cases directly on point, most cases that have analyzed the concept of invitee status have facts in common with the facts of this case, which when taken together, militate in favor of finding W&T to be the invitor.

In *Lewis v. Glendel Drilling Co.*,[12] Avanti Services had a turnkey contract with Pioneer Production to drill a well. Avanti hired Glendel to furnish a barge rig from which the work to drill the well was performed. Avanti hired Schlumberger to perform the well logging services. Avanti was obligated to defend and indemnify Glendel for claims made by Avanti's invitees. One of Schlumberger's employees drowned. Avanti argued that the drowning occurred after completion of Schlumberger's work was performed, and that the work performed afterward was done for Pioneer, making the decedent Pioneer's invitee. The court found that Schlumberger was the invitee of Avanti, noting that "Schlumberger did not do any work on the well other than as requested by Avanti."

Although *Lewis* was decided after *Blanks*, the case that adopted the test for invitee status that was cited above and is applicable in this case, there was no discussion concerning the occupancy of Glendel's barge rig. However, the contract with Glendel was for the use of the drilling barge to drill the well, just as the contract

---

[12]     *Lewis v. Glendel Drilling Co.*, 898 F.2d 1083, 1088 (5th Cir. 1990).

-17-

with Triton was for the use of a vessel to complete the pipeline recommissioning project. Schlumberger's personnel did their work on the barge just as some of Tiger's work was done on Triton's vessel. There was no work done on the pipeline recommissioning project by Tiger other than as requested by W&T or its company representative. While the Triton crewmembers may have directed Tiger's personnel where to stow their equipment/gear and where to bunk, that does not amount to work being performed *for* Triton.

In *Blanks*, ANR, as the owner/operator of an oil well, contracted with Murco to provide a rig and crew to drill the well. Murco was to indemnify ANR for claims made by Murco's invitees and ANR was to indemnify Murco for claims made by ANR's invitees. Although there was no written contract, ANR hired Consolidated to do mudlogging work. A Consolidated employee was injured while assisting a Murco employee on the drill site. The court found that the plaintiff was ANR's invitee on the basis that "invitee status is determined by who invites the injured party on the premises," and it did not matter that the plaintiff was assisting the Murco employee with his work.

In *Terry v. Rebstock Drilling Co.,*[13] Par Exploration contracted with Rebstock to drill a well using its drilling barge. Enserch then assumed the contract from Par.

---

[13]      601 F.Supp. 820 (E.D. La. 1985).

Ensch hired Eastman Whipstock to perform directional drilling work, which included any necessary wireline work.  Eastman Whipstock then hired New Orleans Wireline to perform that work, which was billed through Eastern Whipstock to Ensearch.  A New Orleans Wireline employee was injured on the Rebstock barge. Ensearch and Rebstock had reciprocal indemnity provisions for claims made by their respective invitees.  The plaintiff, as an employee of a subcontractor of Ensearch, was found to be Ensearch's invitee and not Rebstock's invitee even though the plaintiff was working on Rebstock's barge presumably with Rebstock's implied consent.

In *Alex v. Wild Well Control, Inc.*, the plaintiff was employed by Longnecker Properties as a member of the crew of a vessel chartered by Newfield Exploration who was injured by crane operations aboard the vessel while it was performing salvage operations.  The plaintiff sued a contractor of Newfield, Wild Well Control and its subsidiary, Blowout Tools, Inc. (BTI).  The contract between Longnecker and Newfield required Longnecker to indemnify the invitees of Newfield.  The court found Wild Well and BTI to be invitees of Newfield because they were invited by Newfield to work "in connection with the overall salvage operations."[14]

While it is true that Triton's project manager may have contacted Tiger to coordinate logistics of Tiger's arrival, mobilization, and the training of Triton

---

[14]     *Alex,* 2009 WL 2599782, at *10.

personnel, neither that fact, nor the fact that Triton impliedly consented to Tiger working from the diving support vessel, are dispositive as this Court finds that it was W&T, as an occupant of the TRITON ACHIEVER, that directly contracted with Tiger for a specific scope of work, funded and directed all of Tiger's work, and was the entity that explicitly invited Tiger to work on the "overall" pipeline recommissioning project.

W&T argues that Triton refused to perform its work once the $H_2S$ was discovered, that Tiger's training and monitoring benefitted its navigation and dive crews through improved safety, and that only after those programs were in place did Triton go back to work.  What W&T does not acknowledge is that Tiger provided its services not just to Triton but to every other contractor also working on W&T's job and that it was W&T's job – the recommissioning of the pipeline – that was put on hold when the $H_2S$ was discovered.  W&T's argument ignores the fact that Tiger was hired to perform its services not only on Triton's vessel but also on the Odyssea Marine vessel that was also working on W&T's pipeline recommissioning project. Furthermore, the presence of $H_2S$ did not preclude the operation of Triton's vessel; it precluded the continued use of Triton's vessel on this particular job.  The vessel could have been reassigned to another job where there was no $H_2S$ threat, but W&T's project could not move forward at all until the $H_2S$ situation was addressed.  The

-20-

Court therefore concludes that W&T was the party that stood to benefit from Tiger's H$_2$S services and it was W&T's business – completing the pipeline recommissioning project – that was being performed.

Having found that W&T satisfies all of the elements necessary to be Tiger's invitor, this Court declines the invitation to find Triton a "co-invitor."  No reported decisions were located in which a court expressly held that a worker was the invitee of both parties to a reciprocal indemnity agreement resulting in circular indemnity. The case relied upon by W&T suggests in *dicta* that a person might conceivably be an invitee of two entities resulting in the possibility of circular indemnity.[15]   In *Brown*, OOSI argued that if the plaintiff was the invitee of OOSI, he was also the invitee of Sea Mar, resulting in circular indemnity.  The court found that Sea Mar did not hold the right to direct the activities of the vessel, nor did Sea Mar expressly or impliedly invite the plaintiff or his employer aboard the vessel; therefore, the plaintiff was not Sea Mar's invitee.  Thus, the facts in *Brown* are analogous to the facts found by this Court to conclude that a "dual invitor" situation simply did not exist.

Further, as the cases discussed above illustrate, the realities of offshore work applied to the unambiguous language of the contract militate against concluding that the parties intended that an individual could be the invitee of both Triton and W&T

---

[15]     *Brown*, 288 Fed. App'x at 926.

under the reciprocal indemnity obligations.  A typical workplace scenario concerning oil and gas exploration and production activities involves an operator, such as W&T in this case, contracting with service companies such as Tiger, to provide various services to the operator from the deck of a vessel, that was owned, operated, or chartered by a different contractor, such as Triton.  In nearly every such situation, it would be possible to conclude that both the operator and the vessel owner/operator were the concurrent invitors of the service company personnel since (1) both the operator and the vessel operator could conceivably be occupants; (2) the service company would be explicitly invited to the project by the operator, but also implicitly invited to the "specific" work site by the vessel operator by acquiescing in the unavoidable circumstance of the service company personnel working aboard the vessel; and (3) the service company's work would arguably be to the overall benefit of the vessel, which presumably would earn revenue as long as the work continued.

The Court finds that it would be absurd to conclude that in such a situation there are two invitors since this would eviscerate the indemnity provisions of a contract like the one in this case, which contemplates that a worker should be classified as the invitee of one or the other of the contracting parties.  Accordingly, the Court concludes that Grogan was not the invitee of both Triton and W&T.

## CONCLUSION

Based on the facts of this case, the Court concludes that Tiger was W&T's invitee, and therefore, that Grogan, Tiger's employee, was a member of the W&T Group. Having reached this conclusion, it is the ruling of this Court that W&T owes Triton indemnity for its defense costs and the amounts paid in settlement of Grogan's claims. Therefore, judgment will be entered granting Triton's cross-claim against W&T and denying W&T's cross-claim against Triton.

Signed at Lafayette, Louisiana on this 23rd day of October, 2014.

_____

PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

-23-